Clough v. The State.

1. **Practice:** BILL OF EXCEPTIONS. Arguments of counsel on questions raised during the trial, and the remarks of the court in deciding them, serve no useful purpose in a bill of exceptions, and should be omitted.

Clough v. The State.

2. ———: SUPPRESSION OF DEPOSITION: EXCEPTION. When a deposition taken on behalf of the defendant in a criminal case as to his good character is suppressed, and no exception taken, the correctness of the ruling cannot be questioned on error in the supreme court.

3. ———: ———: ———. The taking and preserving of exceptions in criminal cases are governed by the rules established in such matters in civil cases.

4. **Jury**: IRREGULARITIES IN IMPANELING. Mere · irregularities in the impaneling of the jury, not excepted to at the time, are waived, and cannot afterward be taken advantage of.

5. ———: ———. Five of the original panel of twenty-four jurors having been excused for cause, thereupon the selection of the trial jury was proceeded with without first filling the places of those excused. *Held*, proper practice.

6. **Meeting and Adjournment of Court**: PRESUMPTION. The record shows that on the 31st of January the court adjourned until the following morning at 9 o'clock. There was no formal entry, *in the record of the case*, of the opening of the court on the 1st day of February, but it did appear that on "Friday, February 2d, 1877, court met at nine o'clock A.M., *pursuant to adjournment*." It was objected to the record that it showed there was a failure of the court to meet according to the adjournment of the 31st of January, and that consequently the term must be considered as having lapsed. *Held*, that by the entry of February 2d, reciting that the court convened on that day, "*pursuant to adjournment*," it was sufficiently shown that the court must have been in session on the first day of February. *Held further*, that to make such objection available it must be shown, *affirmatively*, that there was a failure of the court to meet, or its continuance in legal session will be presumed so long as business is transacted as of that term, up to the time appointed for the next regular term.

7. **Evidence**: ADMISSION OF IMMATERIAL EVIDENCE: WHEN GROUND FOR NEW TRIAL. To make the admission of immaterial testimony ground for a new trial, it must at least have tended to prejudice the accused.

8. ———: CONDUCT AND APPEARANCE OF PRISONER: EVIDENCE AGAINST HIM. The conduct and appearance of the prisoner about the time of the discovery of the homicide with which he is charged, as well as his declarations concerning it, are admissible in evidence against him.

9. ———: BUSINESS AND SOCIAL RELATIONS BETWEEN THE PRIS-
ONER AND THE DECEASED—EVIDENCE. The theory of the
prosecution being that the homicide was committed by the
prisoner to enable him to possess himself of his brother's prop-
erty, the business and social relations subsisting between them
not only just about the time of the murder, but also for a rea-
sonable time before, are competent evidence.

10. ———: PAYMENT OF MONEY BY PRISONER. And where it is
shown that the deceased was possessed, just before his death, of
a considerable sum of money, it is competent for the prosecu-
tion to prove payments of money by the prisoner just before, as
well as after, the homicide was committed.

11. ———: PAYMENTS OF MONEY TO PUBLIC OFFICER: PROOF OF
MEMORANDUM FROM RECORDS. When a public officer is called
to testify as to payments of money to him in his official
capacity by the prisoner, it is proper practice to permit him to
refresh his recollection from extracts which he has taken from
his own official records, without producing the original. Nor
does the fact that the statute permits certified copies from such
records to be given in evidence preclude the proof of such pay-
ments by the oral testimony of any witness who saw them made.

12. ———: ORDER OF PROOF. The order in which the evidence
for the prosecution shall be introduced is within the discretion
of the judge presiding at the trial.

13. ———: COMPARISON OF BOOT WITH FOOT-PRINT: OPINION OF
WITNESS NOT COMPETENT: EXCEPTION NECESSARY. It is not
competent for a witness testifying of a comparison made be-
tween one of the prisoner's boots and a bloody foot-print found
near the place where the homicide was committed, to give his
opinion as to whether that boot made the track; but where a
witness expresses such opinion and no objection is made until
after verdict, it furnishes no ground for a new trial.

14. ———: ———. The general rule that, in proving a compari-
son between a boot of the prisoner and a track claimed by the
prosecution to have been made by him at the time the murder
was committed, it must be shown that such comparison and
measurements were made before the boot was placed upon the
track, has no application where the imprint is such that no
change could be effected in its appearance by placing the boot
upon it.

15. **Witness:** COMPETENCY OF WITNESS AS TO DECLARATIONS
MADE BY PRISONER. It is not necessary to the competency of
a witness called to testify as to what he had heard the prisoner

say, that he should have heard all he said on that occasion; if what he heard be sufficient to carry an intelligible idea respecting the commission of the offense, it may be given in evidence against him.

16. ———: STATEMENTS MUST BE VOLUNTARY: MUST NOT BE UNDER OATH. The statements of a prisoner to be competent evidence must have been voluntarily made. If made under the obligations of an oath they are not voluntary as a general rule. But when the person, although he be subsequently charged with the offense, appears voluntarily, and gives his testimony before any accusation has been made against him, his statements, although under oath, are admissible.

17. Practice: CROSS-EXAMINATION: NEW MATTER. If a party on the cross-examination of a witness examine him as to a matter not alluded to in chief, he thereby makes the witness his own, and, *on this point*, should not be permitted to cross-examine him.

18. ———: NOT ERROR TO PERMIT THE PROSECUTOR TO RE-OPEN CASE. It is not error to permit the prosecutor to re-open his case, and introduce further evidence in chief, even after the ex-amination of witnesses for the defense has commenced.

19. ———: VERDICT: SIGNATURE OF FOREMAN. The foreman of the jury not having affixed his official character to his signature when the verdict was brought into court, it was not error to permit him to do so in open court and in the presence of the jury before they were discharged.

20. ———: INSTRUCTIONS NEED NOT BE REPEATED: REASON FOR REFUSAL NEED NOT BE GIVEN. When instructions are requested which, although expressed in language somewhat different, are substantially the same as those already given, it is not error to refuse them. Nor is it error, under our system of instructing juries, for the court to fail to give the reason for such refusal.

21. ———: SUFFICIENT PROOF. It is not error for the court, in speaking of the legal presumption of innocence, to say to the jury that, unless this presumption is overthrown by "*sufficient evidence*," the defendant must be acquitted. The use of the term, "sufficient evidence," could not have led the jury to understand that they were at liberty to convict on a mere preponderance of evidence, especially when, in a subsequent part of the charge, they were told that "the proof must be such as to satisfy them beyond a reasonable doubt" of the existence of all the facts necessary to constitute his guilt.

22. ——: MOTIVE TO COMMIT THE CRIME: ABSENCE OF PROOF OF. When the evidence fails to show some motive on the part of the accused to commit the crime charged, this is a circumstance in favor of his innocence which the jury should consider, together with all the other evidence, in making up their verdict. But it is not error for the court to refuse to charge the jury that the absence of such motive "ought to operate *strongly*" in favor of the accused, this being a matter for the jury alone to determine.

23. ——: JURORS: COMPETENCY OF: EXPRESSIONS OF OPINION. Where a juror, on his *voire dire* examination, in answer to questions put to him by the district attorney, stated that he did not think he had formed or expressed an opinion as to the prisoner's guilt, but at the same time admitted that he had "talked with the neighbors about the case," and that he had "explained to some (of his neighbors) since it occurred," who did not know about it; and the juror was accepted without examination, or objection, on the part of the prisoner, it makes a case for the application of the rule, that if a prisoner neglect to avail himself, before the trial, of any of the means which the law provides for ascertaining whether a juror is prejudiced, he will not be entitled to a new trial on that ground.

24. ——: ——. Before a motion for a new trial can be properly granted on the ground of a previous expression of opinion by a juror, unfavorable to the accused, it must appear by the affidavits of both the prisoner and his counsel that neither of them had any knowledge before the verdict was rendered of the expression of such opinion.

THIS was an indictment against the plaintiff in error, Warren Clough, for the murder of his brother, Nathan Clough, at Seward, Seward county, on the first day of May, A.D. 1876. The cause was taken, upon a change of venue, and tried in the district court for York county, before POST, J., at a term of court held in January and February, 1877. The jury returned a verdict of guilty, and the plaintiff in error was sentenced to be hanged in York county, on the thirteenth day of July, A.D. 1877. He thereupon sued out this writ of error. The record in the case is very voluminous, and it is impracticable to give even a condensed statement of the testimony, either

of the chain of circumstances tending to show the guilt of the prisoner, or the matters set up in defense. Nor is this necessary to an understanding of the points passed upon by the court. The judgment of the court below was affirmed by this court, and execution of the sentence fixed to take place on Friday, June 7, 1878. The sentence was afterwards commuted by the governor of the state to imprisonment for life.

*Norval Bros.*, *O. P. Mason*, and *J. R. Webster*, for plaintiff in error.

1. It is error to require defendant to challenge until twelve competent jurors are in the box. It is so held in both civil and criminal cases to be error. *Taylor v. W. P. R. R.*, 45 Cal., 323. *State v. DeRocha*, 20 La. An., 356. U. S. Digest, 1 Series, page 390, Sec. 185, 186. *State v. McCanon*, 51 Mo., 27. *Morgan v. State,* 20 La. An., 442. *People v. Scoggins*, 37 Cal., 676.

2. It was error to overrule the cross interrogatory to the witness, Lee Weldon. (See p. 340.) *People v. Strong*, 30 Cal., 151, 158–9. *Chambers v. State*, 26 Ala., 59, 63. *Com. v. Goddard,* 14 Gray, 402, 404. *Chambers v. Allison,* 10 Mich., 460, 477, and 33 Mich., 419. *Long v. State*, 22 Ga., 40. *Rhodes v. Com.*, 48 Pa. St., 396, 400, 401. *People v. Navis*, 3 Cal., 106. The moving of the bed to the barn was a fact. The deceased going to the barn to sleep was a fact. They were proved, and brought into the case by the prosecution, and every fact connected with these facts, within the knowledge of the witness, was a proper subject for cross-examination. It is a general rule that the declarations of parties at the time of a transaction are usually received in evidence as a part of the *res gestae*. *Ogden v. Peters*, 15 Barbour, 560. *Davis v. Phillips*, 63 N. Car., 207. *Stauffer v. Young*, 39 Penn. St., 455. *Chaney v. State*, 31 Ala., 342.

3. There is error in giving to the jury the 8th instruction and the first instruction numbered 25 (of which number there are two), for these instructions clearly allow the jury to convict on the mere preponderance of testimony; and the error is not corrected by other parts of the instructions given on the same point, though they should be correct, for ambiguous instructions, by which the jury may be misled, and from which conclusions prejudicial to the prisoner may be drawn, is error. *Almer v. People*, 76 Ill., 150. *Caw v. State*, 3 Neb., 357, 370.

4. The twenty-second instruction given is error, for it assumes that the comparison of the boot and footprint had been made as the law requires; whereas, the evidence shows the comparison was made by placing the boot on the footprint; and the jury should have been instructed to exclude the evidence from their consideration. Wells' Cir. Ev., 104. And is further error because it gave undue prominence to this evidence. *Rutherford v. Morns*, 77 Ill., 425. *Frame v. Badger*, 79 Ill., 441, 446. *Myer v. Midland Pacific R. R.*, 2 Neb., 338.

5. After its adjournment, made on Wednesday, the thirty-first day of January, to Thursday, the first of February, at 9 A.M., the court did not meet pursuant to its adjournment. The term then being held dissolved, the court had no jurisdiction to meet February 2d, or to receive a verdict. The jury had no authority to consider the cause, to find, make, sign, or file a verdict. *Wight v. Walbaum*, 39 Ill., 554. *People v. Sanchez*, 24 Cal., 17. *State v. Roberts*, 8 Nev., 239. *People v. Brodwell*, 2 Cowen, 445. *Thomas v. Fogarty*, 19 Cal., 664. It cannot be presumed that there was a meeting and adjournment of the court. Nothing can be presumed but what appears on the face of the record. *Dyson v. State*, 26 Miss., 362, 383. *Dodge v. State*, 4 Neb., 220, 223.

6.   The court erred in refusing to consider the supplementary motion for a new trial. *Henrie v. The State*, 41 Tex., 573.   And while the court should not allow a second motion for a new trial for the same cause or causes, but only for a cause which the party, using due diligence, had failed to discover until his original motion was determined, a second, and even a third, motion may properly be allowed.    *White v. Perkins*, 16 Ind., 358, 360.   *Henrie v. State*, 41 Tex., 573.

*George H. Roberts*, Attorney-General, *M. B. Reese*, District Attorney, and *George W. Lowley*, for the State.

1.   As to the examination of Lee Weldon, nothing was testified to by him in his examination in chief which could be construed into showing any effort or statement on the part of the defendant or his wife, trying to induce Nathan Clough to sleep in the barn.   Therefore the question proposed was not proper cross-examination. Also any statements or expostulations made by the defendant's wife would be inadmissible.   And proof of any objections, statements, or expostulations made by defendant, would only be proving his own statements in his own defense.   The question in the form it was presented was certainly objectionable, and the court did not err in sustaining the objection.   The mere fact or Nathan sleeping in the barn never has been claimed as a criminative circumstance.   But that defendant formed the purpose to kill that afternoon or evening on learning that Nathan had changed his manner of keeping his property, and that he had been living with his wife when in Iowa.   When a conversation is given in evidence, the other party has a right to have all that was said on the same subject, but nothing else, even if in the same conversation.    52 Ind., p. 124.    1 Am. Law Reg. (N. S.), p. 47.

2. In the absence of a bill of exceptions showing that the court did not meet upon Thursday, and the assigning the same for a new trial, the court must presume that it did meet, and adjourned till Friday, which was the case. *Casper v. The State*, 27 O. S., 578. *Bond v. The State*, 23 O. S., 349. *Smith v. The State*, 4 Neb., 278. *Fillion v. The State*, 5 Neb., 351.

LAKE, J.

This is a proceeding in error, brought to reverse the judgment of the district court for York county, and before proceeding to consider the matters alleged to be erroneous I wish to say a word relative to the record of the case, as made up and submitted for our examination. It consists of a bundle of closely written manuscript covering over *eleven hundred* pages, and being at least double the quantity actually necessary or proper for a full and complete presentation of the questions brought here for review. For instance, there is page on page taken up with the arguments of the respective counsel on the numerous questions constantly raised during the trial as to the admissibility of testimony, and also with the remarks of the court in assigning reasons for the rulings thereon, all of which serve no useful purpose, but tend materially to encumber and obscure the record, and to increase the expenses of a trial far beyond what is legitimate.

In reporting the testimony of a trial care should be taken to give the questions and answers *verbatim,* and when an objection is made it should be briefly noted, together with the decision of the court thereon. For example, if, on the examination of a witness for the prosecution, a question be objected to by the defendant's counsel as being leading, or irrelevant, all that is necessary is to note at the end of the question: "Ob-

jected to by the defendant because it is leading," or: " because it is irrelevant," as the objection may be, followed by: "Objection sustained," or, "Objection overruled;" and if an exception be taken to the ruling, to note the fact. And the same course should be pursued with respect to any other objection that may be urged upon the attention of the court during the trial.

It not unfrequently happens that quite lengthy arguments are made by counsel on questions thus raised, and in deciding them the judge may see fit to give elaborate reasons for his decisions, but neither of these has any business whatever in the record, nor should the stenographer be permitted to encumber his report with them, when it can only result in augmenting his compensation, with nothing valuable given in return.

I have been led to make these remarks, not alone because of the unsightly appearance of the record in this particular case, but also because of the very frequent carelessness and inattention that seems to characterize the making up of records for this court, and in the hope that hereafter we shall be spared the task of being compelled to rummage as in a "waste-basket," in order to discover those matters which have a legitimate bearing upon the questions to be decided.

In the consideration of the alleged errors it will be most convenient to take them up in the order observed in their assignment; and the first to be noticed is that relating to the suppression of the deposition of A. W. McDonald, taken on behalf the prisoner, as to his good character while living in Iowa. As to the ruling of the court in suppressing this deposition, no exception seems to have been taken at the time it was made; it must therefore be regarded as having been acquiesced in, and its correctness cannot now be questioned. By Sec. 482 of the criminal code it is provided that the taking and preserving of exceptions shall be governed "by the rules

established in such matters in civil cases." And by Sec. 308 of the code of civil procedure it is declared, that: "The party objecting must except at the time the decision is made," etc.

The second and third assignments, relating to the mode of impaneling the jury, are substantially the same, and may be considered together. The substance of these objections is, that when five of the original panel of twenty-four jurors had been excused for cause, the court did not require their places to be filled before proceeding further in the selection of the jury to try the case. The short answer to this objection is the same as given to the one just disposed of, viz: That no exception was taken at the time, and even if the course pursued were irregular, the irregularity was waived, and could not afterwards be taken advantage of. We desire to add, however, that the method adopted in the selection of the jury conformed to the prevailing practice in this state, and has our entire approval. Until the original panel were completely exhausted, the court could not have known that there would be any necessity for a further call, as it can never be known in advance to what extent the parties will exercise their privilege of challenge.

The fourth, fifth, and sixth assignments all pertain to the same subject, and may be disposed of together. The record shows that on the conclusion of the arguments in the case, on the thirty-first day of January, the jury were instructed by the judge, and sent out in charge of a sworn bailiff to consider of their verdict, and thereupon the court adjourned until nine o'clock on the following morning. The next step in this case, as shown by the record, was taken on the second of February, when the jury, having agreed, came into court with their verdict, and delivered it in the presence of the prisoner and his counsel. It is now objected, that inasmuch as the

record of this case does not show affirmatively that the court met on the *first* day of February, according to its order of adjournment on the day previous, and again adjourned to February 2d, the day the verdict was received, the term must be held to have lapsed, and the authority of the court to proceed further with the case to have ended. This is a very technical objection, having nothing substantial to rest upon. Referring to the record, however, we find that on this point it speaks in the following unequivocal language: "Friday, February 2d, 1877, court met at 9 o'clock A.M., pursuant to adjournment." So that there must have been a session of court on the preceding day according to the adjournment of the thirty-first of January, or this entry is false, which we cannot presume. The probability is, that inasmuch as there was nothing done in this particular case, in open court, the jury being still out, it was thought by the clerk to be quite unnecessary to encumber this record with the orders opening and adjourning the court on that day. To make an objection of this sort available, it should be shown affirmatively that there was a failure of the court to meet on the day to which it stood adjourned, and that its subsequent meeting was not in pursuance of an authorized adjournment. Unless this be done, its legal continuance will be presumed, so long as the court continues to transact business as of that term, even to the time appointed by law for the next regular term to be held.

The seventh assignment consists of no less than eighteen sub-divisions, and relates exclusively to alleged erroneous admission of testimony at various stages of the trial. We have examined the record as to each of these objections, but in this opinion shall notice particularly those only in which counsel for the prisoner seemed to place some confidence, as being good ground for reversal of the judgment.

The first in order of the testimony objected to is that given by R. S. Norval, as to where Nathan Clough said he had obtained a package of money, containing a thousand dollars, handed by him to witness on the twenty-seventh of April, on the occasion of his loaning to one Lyons the sum of one hundred and fifty dollars. · On this point the testimony of Mr. Norval was as follows:

Q.  You may state to the jury what you know about Nate (the deceased) drawing $1,000 from the bank, and the time?

A.  On the Thursday before the murder was committed Nathan Clough desired me to loan some money, or rather, I spoke to him about a party, a Mr. Lyons, who was in town, who desired some money, and I told him I guessed I could get it from Mr. Clough; that he had some money. I saw Nathan Clough in the post-office, and I went with him from the post-office down to his barn to see his horse, and Mr. Lyons remained in the post-office until I came back. I spoke to him about the money and Nathan Clough then went in the direction of the bank, or to the hotel, from the corner where Redfield's store is, and he came back with $1,000 in money.

Q.  What time in the day was that?

A.  That was, perhaps, in the middle of the afternoon.

Q.  Did you loan some money?

A.  I loaned $150 to Mr. Lyons for the deceased, on six months time. The mortgage I either delivered to Mr. McKillop, the administrator, or to Mr. Lyons when paid off.

Q.  You may state to the jury what Nathan said about the $1,000 when he brought it into your office?

Objection by defendant's counsel. This is Thursday, and he now asks what Nathan said about the $1,000 that he brought into his office. Objection overruled and exception entered.

Clough v. The State.

A. Well, as I stated, he brought the $1,000, and handed the whole package to me. It was all in one package, and by making the change myself I managed to get out $150 to consummate the loan that I had made.

Q. Where did you say the money had come from?

Objection by defense. Objection overruled and exception entered.

A. I understood that the money came from the bank. The State Bank of Nebraska, at Seward; Mr. Jones' bank.

As to the testimony we have quoted, it will be noticed that not a single valid reason was given for the several objections made. This fact of itself is a sufficient ground for upholding the ruling of the court in its admission. *Horbach v. Miller*, 4 Neb., 31. But further, even conceding that, according to the rules of evidence, the testimony as to what Nathan said in the absence of the defendant ought not to have been admitted, still it is very clear that its admission could have worked no possible prejudice, for the reason that it was established beyond all question, by other testimony, especially by that of C. W. Barkley, the cashier of the bank, on his cross examination by the prisoner's counsel, that the deceased did draw this $1,000 from the bank on the twenty-seventh of April, the same day the $150 loan to Lyons was made, and on a certificate of deposit that had been issued to the prisoner, and which was indorsed by him so as to enable the deceased to draw the money on the very day it was paid. The exclusion of this testimony of the witness Norval, as to the declarations of the deceased, would therefore still leave the fact which it tended to prove clearly established by other incontrovertible evidence, and to which no objection was made. Where such is the case, the error is without prejudice, and is no ground for setting aside the verdict. It is

claimed under this head also, that there was error in the admission of portions of the testimony of the witnesses Hall, Thomas, Nihardt, and Mrs. Clough, particularly referred to in the brief of counsel for the plaintiff in error. In addition to the fact that the record discloses no ground of objection, in consequence of which it would in any event be impossible to say that the court was in error, we see nothing in the testimony itself of which the prisoner could have reasonably complained, and we think it was properly admitted.

A witness named Newton, called on behalf of the state, having testified that on the morning after the murder was committed he saw the prisoner, and noticed that he had "*a peculiar look, as I have many times before,*" was then asked this further question:

Q. You stated to the jury that you noticed a peculiar look at that time, as you had at other times. Now state to the jury the circumstances under which you saw that peculiar look at those other times?

Objection by defense, as leading, irrelevant, and incompetent. Objection overruled and exception entered.

A. I noticed while living with Mr. Clough whenever there was anything troubled him, he had a different look from what he did at other times. If he had any difficulty with any one, his manner,—his appearance, was altogether different from what it was at other times. I suppose it would be with most anybody, too.

It does not seem to us that there is anything in this testimony at all prejudicial to the prisoner. The witness noticed that he had "a peculiar look," but this he had observed "many times before," especially whenever he had a "difficulty with any one." But of what this peculiarity consisted the witness in his direct testimony does not tell us, nor but partially on his cross examination. It would have been entirely proper for the prosecution to have shown by this witness, if he knew, just

what the conduct and appearance of the prisoner were at the time referred to, for these, like the declarations of a person accused of crime, are competent evidence against him on the trial.

This witness was also asked to relate a conversation he had with the prisoner, concerning the property of the deceased, some three years before the murder was committed. This was objected to on the part of the defendant, not on the ground that his declarations on this subject were irrelevant, or immaterial, but simply because they were made so long previous to the homicide.

The object of the testimony thus called for, as stated by counsel for the state, was to show that the prisoner then controlled the property of the deceased, and that it was the purpose of the prosecution to show that he had continued to hold and control it up to about the time his brother was killed, when certain arrangements were entered upon by which the deceased was depriving him of that control. The theory of the prosecution being that the prisoner committed the murder in order to possess himself of his brother's effects, we think the question was proper, especially so in view of the answer which followed. The witness answered: "Mr. Clough said to me that he had got Nathan's property in his hands, and that if he ever lived with his wife again he would be d——d if he should ever have a cent of it."

The case being one of circumstantial evidence entirely, it was very proper to show both the business and social relations subsisting between these brothers, not only just about the time of the alleged murder, but also for a reasonable time before. In respect to this sort of testimony it may be said, that it would be exceedingly difficult, if not absolutely impossible, to set a limit as to the time within which it must have occurred, inasmuch as whatever took place between them, having a direct tendency to show a motive on the part of the prisoner

to commit the crime charged, is certainly competent for the consideration of the jury in determining the question of his guilt.

As to the testimony of the witness Leese, respecting his footings of some figures found on a card in the pocket-book of the deceased, we fail to see wherein it was relevant, or valuable for any purpose connected with the trial. It showed merely that these figures probably referred to the amounts of a number of promissory notes belonging to the deceased, and which were also in the book when found. While we fail to discover how this testimony could have benefited the prosecution, we are equally at a loss to see wherein it could, in the least degree, have prejudiced the prisoner.

The testimony of the witness Herrick, who was the deputy treasurer of Seward county, as to the amount of taxes paid by the defendant a few days before the murder, was objected to on the ground that it was " incompetent, irrelevant, and immaterial." The reason urged upon the attention of the court for this objection was, that it was a transaction occurring *before* the homicide, admitting, at the same time, that payments of money made *after* the homicide would be competent evidence. The objection was overruled, and as we think rightly; and thereupon the witness testified to the payment by the prisoner of something over two hundred dollars on his tax account.

This testimony was certainly admissible. The theory of the prosecution was that the deceased was killed for his property, and especially for the obtaining of the money that he was then supposed to have in his possession; and the design of this evidence was to show that the money expended by the prisoner just about that time, together with what was found upon him, greatly exceeded all that he honestly possessed.

After this witness had testified fully to the payment

of these taxes, and had been subjected to a cross examination of great length, covering over three pages of the record, a motion was made by the prisoner's counsel to strike out the testimony and take it from the jury altogether, for the reason that the witness had refreshed his recollection by reference to a memorandum, or transcript, which he had copied from the county tax record. But upon the witness swearing that he had a distinct recollection of the transaction, as much so as if it had taken place " but yesterday," the court refused the motion, and this is alleged as ground for reversal. In this there was no error. Even conceding that if made at the proper time the objection would have been valid, still by not making it when the testimony was first offered, and permitting it to go to the jury, it came too late. Besides, we think it was proper practice to permit the treasurer to refresh his recollection from extracts which he had taken from his own official record, without producing the original in court. *Howland v. Sheriff of Queen's Co.*, 5 Sandf., 219.

It is true that, under our statute relating to evidence, a duly certified copy from the " treasurer's cash book " might have been used to prove these payments (Sec. 408, Tit. 10, Rev. St.), but this would not preclude the state from proving them by the oral testimony of any witness who saw them made.

An objection was made to the testimony of the two witnesses, Bailey and Johns, concerning a pair of bloodstained pantaloons introduced in evidence, on the ground that they had not then been identified as the ones worn by the prisoner. It is not pretended that they were not fully identified before the close of the testimony by other witnesses. Indeed, the testimony, especially that of the witness Leese, shows that their identification was complete. The question raised was one of the order in which the testimony should be produced, and was

peculiarly within the discretion of the judge presiding at the trial.

It is claimed also that the court erred in the admission of the testimony of the witness Carnes as to his examination of a bloody foot-print upon a piece of oil cloth that was found lying beside the bed on which the deceased was murdered, and his comparison of this track with the prisoner's boot. The witness was asked: "Did you compare that boot with the track?" Answer: "I did, sir." Question. "State to the jury how it compared with the track?" It was objected to this question that the witness should state the *manner* "in which he made the comparison and not his conclusion." This objection was overruled, but, as the witness did not answer, it presents no question for this court to review. Thereupon this question was put, which it will be noticed conformed strictly to the suggestion just made by the prisoner's counsel: "State to the jury how you compared it with the track?" And there being no objection the witness answered: "I had a piece of oil-cloth before me with the imprint upon it, and upon taking the boot —it was a peg boot—upon examination I found that the heel had nails protruding from it; they were not regular, but protruding from the heel, the leather having been worn off faster than the iron; and by placing this upon the nails of the heel, and bringing them down where the nails struck, it covered the imprint, *and the probability seemed to be that that boot made the track.* I don't think I could say, and I don't think anybody could say, but a similar boot made the track."

That portion of this answer which we have italicised was very clearly incompetent, but there was no motion made to exclude it, nor was the attention of the court in any way called to it until after verdict. This testimony falls within the general rule of evidence that the opinions of witnesses, except in the case of experts called to testify

upon questions of science, or skill, and the like, are not admissible. The witness having detailed the mode of his examination and comparison, this was all he could properly do. Whether that particular boot-heel made the imprint described, was for the jury to determine from all the facts and circumstances developed, uninfluenced by any opinion which the witness himself may have formed. But, the court below not having been required to pass upon the admissibility of this testimony at the time of its production before the jury, there is nothing in the record showing that any error was committed with respect to it.

A witness named Osborne was called on behalf of the state to testify, among other things, of a conversation that took place a few days after the murder, between the widow of the deceased and the prisoner, and having stated that he "could not hear all the conversation," it was objected that he should not be permitted, for this reason, to give in evidence that which he actually heard. This objection was very properly overruled. It implied that in no case should a witness be permitted to testify of a conversation between the prisoner and another person unless he happen to have heard the whole of it. This clearly is not the law. If what the prisoner is heard to say in such a conversation be sufficient to convey an intelligible idea respecting the commission of the offense with which he is charged, it may always be given in evidence against him. To this rule, as applied to voluntary statements, we know of no exception.

It is also urged as error, that evidence was admitted as to certain declarations made by the defendant before the coroner's jury. This was objected to on the ground that they were "not the voluntary declarations of the prisoner," and that he could not be compelled to "produce evidence against himself," etc.

It would be a sufficient answer to this objection, that

the record does not show that the prisoner was under oath when these statements were made. When not made under the obligations of an oath, his statements are taken as having been voluntarily made and are admissible against him. 1 Phillips on Ev., 4th Am. Ed., 523, et seq. But the rule which the prisoner's counsel seeks to have applied undoubtedly governs in case of declarations made on such examination by a person under arrest or charged with the crime, and also under oath. But when the person, although he be subsequently charged with the offense, appears voluntarily, and gives testimony, before any accusation has been made against him, his statements are admissible in evidence against him on the trial of an indictment for the crime. *The People v. Hendrickson*, 1 Parker Crim. Repts., 406. *The People v. Thayers*, Id. 595. *Case of Broughton*, 7 Iredell, 96.

The next assignment in order relates to the exclusion of an interrogatory propounded to the witness Lee Weldon on his cross-examination as to certain declarations claimed to have been made by the prisoner and his wife to the deceased, relative to his first going to the barn to sleep. It appears from the record that this witness had testified in chief of the deceased going to the barn, where he was murdered, to sleep, as follows:

Q. When was it that you said Nate slept in the barn?

A. The Friday night before the murder.

Q. Do you know when that bed was taken up there?

A. I think the bed had been there and that the clothes had been taken up that day.

Q. Friday?

A. Yes, sir.

On the strength of this direct testimony the following cross-examination took place:

Q. You say that on the Friday previous Nathan Clough had moved this bed out to the barn to sleep?

A.  Yes, sir.

Q.  Now state to the jury at whose instance he took that bed and went to the barn to sleep?

A.  I think it was his own.

Q.  State if it is not the fact, and if you don't know it to be the fact, that both Warren Clough and Warren's wife expostulated with and protested against Nathan going to that barn to sleep?

This question was objected to by counsel for the state, " on the ground that the statements of Warren Clough, and his wife, are not admissible in his favor." The court sustained the objection, and this is alleged as error.

We think the court ruled correctly.  There was nothing stated in the direct examination as to why the deceased went to the barn to sleep.  The simple fact that he went there to sleep, and the time when, were all. There was nothing that tended to show that he was induced to go there by anything either said, or done, by the prisoner or his wife.  Besides, by going beyond the strict limit of a cross-examination by the question preceding this one, the defense had proved that the deceased went to the barn to sleep at his own instance. In this he made the witness his own, and on this point should not be permitted to cross-examine him.

The governing rule on this point is:  " That a party has no right to cross-examine any witness, except as to facts and circumstances connected with the matters stated in his direct examination; and that, if he wishes to examine him as to other matters, he must do so by making the witness his own, and by calling him as such in the subsequent progress of the cause."  1 Greenleaf on Ev., Sec. 445.

It is further complained, and assigned as error, that after the testimony for the state had closed, and the defendant had introduced the testimony of a number of witnesses, the prosecutor was permitted to open his case

and introduce further testimony.   On this point the record shows, that in consequence of sickness, Luke Agur, a witness for the prosecution, was unable to be present until after the close of the examination of the other witnesses for the state, and, on motion, leave was given to examine him afterwards upon giving to the defendant a written notice of the points upon which he was expected to testify.   The notice was accordingly given, and when the witness was subsequently called his examination was confined strictly to the points named.

In this we see nothing to complain of.   It is a practice well supported by authorities, and we think that the court exercised its discretion in the matter with marked caution, by requiring the notice of what the witness would testify to, so that the prisoner should not be placed at a disadvantage.   In criminal as well as in civil cases it is within the discretion of the court to receive further evidence on the part of the prosecution, even after the summing up has been commenced.   But this discretion should be exercised with the utmost caution.   *Kalle v. The People*, 4 Parker Crim. Repts., 591.

The record further shows that the verdict, as presented by the jury, although signed by all of the individual jurors, was not signed by any one of them as " foreman." By direction of the judge this omission was thereupon at once supplied by the foreman, in the presence and by the consent of all the other jurors, without returning to the jury room.   And this is assigned as error.   There was no necessity for sending the jury out again to cure this technical defect.   Indeed, we think the verdict was good as first presented.   It was signed by each one of the jurors personally, and that was sufficient to show that they had all agreed to it, which is all that the law requires.

Another ground upon which error is alleged is: "That

the court refused to give to the jury every instruction requested by the defendant." On this point it was not seriously questioned that the substance of the instructions requested on behalf of the prisoner was fairly included in the general charge, prepared by the judge on his own motion, and as given to the jury. But it is contended that, it "is not enough that a proper instruction asked by the prisoner has been *substantially* given," * * * * * that his counsel "have the right to draw and request instructions, and to insist that, if correct, they shall be given, though the court may include the same matters in his general charge."

The supreme court of California, speaking on this subject, say: "If upon the examination of the instructions given we see that all, in substance, which the defendant asked for, and was entitled to, was fully and fairly submitted to the jury, we cannot presume that he was injured by the refusal of the court to reiterate the same thing, even though submitted in a different form." *The People v. Strong*, 30 Cal., 151. And following what we conceive to be a sound rule of practice, this court held in the case of *Curry v. The State*, 5 Neb., 412, in substance, that an instruction need not be repeated, although expressed in language somewhat different from that used by the court in its charge already given. See also on this point: *State v. Volmer*, 6 Kan., 371. *State v. Schlagel*, 19 Iowa, 169.

But, it is urged, that if the court is at liberty to refuse an instruction merely because it has been once given, the refusal must be placed strictly on that ground; and so it was held in the case of *The People v. Hurley*, 8 Cal., 390, and also in one or two other cases cited by the defendant's counsel. The reason given by the supreme court of California for the enforcement of this rule is that: "Unless this is done in the presence of the jury they may be misled by the refusal."

Undoubtedly where the practice prevails both to request, and give instructions to the jury orally, this would be a very safe, and we doubt not, salutary rule of practice. It would certainly leave no ground for the jury erroneously to infer, merely from the rejection of an instruction which states the law correctly, that the court dissents from the proposition therein contained, when it is in fact refused for no other reason than to avoid needless repetition. And further, it would seem to be but respectful and just to counsel requesting such an instruction to state the reason why it is refused.

But, under the practice which now very generally prevails in this state, and that was evidently contemplated by the passage of the act of February 25th, 1875, we do not think that the non-observance of this rule can be regarded as any cause for complaint even, much less for setting aside the verdict of a jury. By section three of this act (Laws 1875, p. 77) it is provided that: " The court must read over all the instructions which it intends to give, and none others, to the jury, and must announce them as given, and shall announce as refused, without reading to the jury, all those which are refused, and must write the words 'given,' or 'refused,' as the case may be, on the margin of each instruction." And by section one it is provided that " all instructions asked shall be in writing," so that if the statute is observed it is hardly probable that the jury can know what disposition the court makes of instructions requested by counsel on either side of the case.

Of the instructions which it is complained that the court refused to give, it is only necessary to say that we have examined each one of them very carefully, and find that they are all very fully and fairly covered by the charge as given to the jury, so far at least as they state the law correctly. As to the *fourth* instruction refused we think it erroneous: It was in these words: " If the

evidence fails to show any apparent motive on the part of the accused to commit the crime charged, it ought to operate *strongly* as a circumstance in favor of the accused." It would not have been proper for the court to have charged the jury as matter of law what effect the failure to show a motive to commit the crime should have. The court had no right to say whether it should operate "strongly" or otherwise; but, rather, that it was a circumstance in favor of his innocence which the jury should take into the account, and consider, together with all the other facts and circumstances, in making up their verdict. And this the court in effect charged.

Of the instructions given, no complaint is made in the brief, except to the eighth, twenty-second, and twenty-fifth. The objection raised to the first of these instructions is, that in speaking of the effect of the legal presumption of innocence the court said: "Unless this presumption is overthrown by *sufficient* evidence the defendant must be acquitted." Implying, as is claimed, that the jury were at liberty to convict on a mere preponderance of evidence. But this is not a fair construction of the language when taken in connection with another portion of the charge, wherein the jury are told what amount of evidence may be regarded as sufficient. Toward the close of the charge this language is used: "And as the defendant's guilt is only established by sufficient proof of several material particulars, the proof must satisfy the jury *beyond a reasonable doubt* of the existence of such facts necessary to constitute guilt, or the defendant must be acquitted." And in other portions of the charge similar language is used, so that it must have been very firmly impressed upon the minds of the jury that before they could rightfully convict the prisoner of the crime charged against him, they must be satisfied to a moral certainty of his guilt, from a consideration of all the evidence produced before them on the trial.

The objection made to the twenty-fifth instruction is the same, and as to it nothing additional need be said.

The twenty-second instruction relates to the comparison between the foot-print and boot, made and testified to by the witnesses Carnes and Agur.    It was in these words: " If you believe, from the evidence, that the foot-print which has been described by the witnesses Carnes, Agur, and others, as found by the bed of the deceased the morning on which the murder was discovered—I say if you believe that such track was made at the time of the murder, then the question, who made this track, becomes of the highest importance as a means to assist you in your deliberations.

" And in determining on the evidence which has been given on this subject, you should inquire from the evidence whether one of the persons who went to the barn on the morning of the discovery to see the dead body, or for other lawful purposes, might not have made the track.    Also, whether the defendant might not have made the track at the time he first went into the room on the morning of the discovery.

" If you determine that it could not have been so made, then the care, accuracy, and honesty of the comparison of the boot with the track is of the greatest importance.    And as a means of guarding against mistake, the law requires that the boot or shoe which the prosecution claims made the impression should be compared with the foot-mark before the boot is placed on the track. Otherwise the track might be fashioned so as to fit the boot at the time of making the comparison.    But if, after giving the defendant the benefit of all doubts and precautions upon this question, you believe that the prisoner's boot, when carefully and correctly compared with the foot-print, corresponds with such track both in size and shape, this would be a circumstance for you to consider.    And if you should find that there were impres-

sions of nails in the portion of the track made by the heel of the boot which, on comparison, exactly correspond with the nails found in the heel of defendant's boot, this would be a circumstance the weight of which you can readily comprehend."

The only fault that we can see in this instruction is found in the third paragraph. If the track had been made in dust, or other substance easily imprinted, then what is said as to the legal effect of placing the boot on the track, before making the comparison, would have been applicable and proper. But the testimony shows that the track was evidently made by a boot, or shoe, which had just before been stepped in blood, of which there was a pool on the floor near the head of the bed; and that a portion of the blood sticking to the sole, together with the heel nails, composed the track in question, and was left upon the hard surface of a piece of oil-cloth, the blood having become perfectly dry, and the imprints of the nails being plainly seen by the witnesses, and evidently requiring considerable pressure, in addition to the mere weight of the boot, to have made them. Under these circumstances, when taken in connection with the fact that there was testimony tending to show that the boot may have been placed on the track before any other comparison was made, we think this portion of the instruction was calculated to prejudice the prosecution by possibly leading the jury, without a sufficient reason, to reject the testimony respecting the track altogether. We think the instruction, therefore, more favorable to the prisoner than he could of right have demanded, and that in the giving of it he has not the slightest cause for complaint.

It only remains now for us to dispose of the questions raised as to the alleged bias of the two jurors, Finley C. Ferguson, and J. F. Conway, for which it is claimed the verdict ought to have been set aside. The objection

made to the juror Ferguson was included in the first motion for a new trial, and was supported by the affidavits of Nelson White, H. B. Gue, and Levi Richardson, in which they each swear that in May, 1876, very soon after the murder was committed, Ferguson had said in their presence that he knew the prisoner, that he was a " bad " or " hard " man, and that " he was guilty of the murder," as was stated in the affidavit of Gue, or that " he believed he was guilty," as was stated by the two other affiants. There was also produced the affidavit of R. S. Norval, one of the attorneys for the prisoner, that neither he, nor his counsel, knew said juror had formed or expressed this opinion until " after the jury had retired to consult on their verdict."

On the part of the state the counter-affidavit of the juror Ferguson was produced, supported in several particulars by that of his wife. Ferguson in his affidavit completely contradicts in every particular the material statements of White, Gue, and Richardson; and even White himself comes forward with a second affidavit wherein he contradicts nearly every statement which he first made, and declares that in his first affidavit " he intended to testify that he *thought* he had heard the said Finley C. Ferguson express opinions on the question of the guilt or innocence of the said defendant Warren Clough, but that this affiant did not remember at the time he made the said affidavit what these opinions of the said Finley C. Ferguson were, but that this affiant's impressions are that said Ferguson expressed a doubt as to the defendant's guilt."

After a careful examination of these several affidavits we are satisfied that Ferguson was a competent and unbiased juror, and that the motion to set aside the verdict on account of the declarations imputed to him was properly overruled.

The matter respecting the juror Conway was brought

to the notice of the court by a second, or supplementary motion for a new trial, after the one first filed had been overruled. This, too, was supported by several affidavits showing that on several occasions during the summer preceding the trial, Conway had stated that he had formed an opinion as to the guilt of the prisoner, and that he believed him to be guilty of the murder of his brother. The district attorney moved the court to strike this motion and affidavits from the files for the reason that they were filed after one motion for a new trial had already been made and overruled. The court sustained this motion, and we think improperly. A prisoner has the right to bring newly discovered matter, going to the disqualification of a juror, to the attention of the court at any time before the judgment is finally rendered on the verdict, notwithstanding a prior motion based on other causes may have been overruled, provided there has been no want of the exercise of due diligence. *Henrie v. The State*, 41 Tex., 573. *White v. Perkins*, 16 Ind., 360.

But the court having made this summary disposition of this supplemental motion, necessitates an examination of the record for the purpose of seeing whether it were not well taken, precisely the same as if it had been overruled.

Turning to the examination of the juror Conway when called to the jury-box, we find that the only questions put to him were by the district attorney. In answer to the question whether he had "formed or expressed an opinion as to the guilt or innocence of the defendant," he said: "No, I don't believe I ever have." He was also asked whether he had "ever talked with the neighbors about the case?" To this he answered: "Yes, sir. I have explained to some since it occurred." Question. "Persons who knew or claimed to know anything about it?" Answer. "No, sir." He further stated

that he had no bias or prejudice "against the defend-
ant." From the answers given to these questions it
was clearly shown that the juror had talked and "ex-
plained" about the case, to those of his neighbors who
were unacquainted with the facts; and it did not seem
to be clear from the answer given that he had not both
formed and expressed an opinion as to the prisoner's
guilt. We think at least that there was sufficient dis-
closed to have led a vigilant defense to make a still
further examination as to the character of his explana-
tions to his neighbors, with the view of ascertaining
whether he might not have expressed some sort of opin-
ion, conditional or otherwise, as to the defendant's
guilt. The law has provided the means of thoroughly
testing the fairness of every person called to serve as a
juror, and it seems to us that in view of the admissions
made by this juror, and the total failure of the defend-
ant's counsel to make a further and thorough examina-
tion as to his declarations, in order to ascertain whether
or not they amounted to the expression of an opinion,
he is not in a situation now to make this complaint. If
a prisoner neglect to avail himself before the trial of any
of the means which the law provides for ascertaining
whether the juror is prejudiced, he will not be entitled to
a new trial on that ground. *Meyer v. The State*, 19
Ark., 156. *Callin v. The State*, 20 Ib., 36. *Parks v.
The State*, 4 Ohio St., 234.

But there is still another sufficient reason why the
objection to these jurors cannot be permitted to prevail.
Before a motion for a new trial can be properly granted
on the ground that a juror has expressed an opinion un-
favorable to the prisoner, "it must appear by the affi-
davit, of *both the prisoner and his counsel*, that neither
of them had knowledge before the verdict of the declara-
tions made by the juror." *Anderson v. The State*, 14
Geo., 709. *Parks v. The State*, cited above. As to the

juror Ferguson, several of the defendant's attorneys of record made no affidavit, and, as before shown, that made by R. S. Norval, Esq., shows that he knew of the facts relied upon before the jury had brought in their verdict. As to the juror Conway, the prisoner and several of his counsel made the requisite affidavits, but two of them, Messrs. Whedon and Bates, did not. Therefore the motions based upon the alleged bias of these two jurors cannot be sustained.

After a careful review of the record we are satisfied that the prisoner has had a fair trial, and the judgment of the court below must be affirmed.

JUDGMENT AFFIRMED.